# EXHIBIT 1 (a)

DocuSign Envelope ID: 380537DB-A104-4DB9-9D7D-FF8B93C35523

EXECUTION COPY

# CO-DEVELOPMENT, LICENSE AND SUPPLY AGREEMENT

This **Co-Development, License and Supply Agreement** (this "**Agreement**") is hereby entered into and as of January 31, 2022 (the "**Effective Date**") by and among Endo Ventures Limited, a company organized under the laws of Ireland, with its registered offices located at First Floor, Minerva House, Simmonscourt Road, Ballsbridge, Dublin 4, Ireland ("**Endo**"), on the one hand, and RK Pharma, Inc., a Delaware corporation having offices at Building 215/215A, 401 North Middletown Road, Pearl River, New York 10965, USA ("**RK Pharma**"), and Apicore Pharmaceuticals Pvt. Ltd., an Indian company with offices at Block No. 252-253, NH228, Dhobikuwa, Gujarat 391440, India ("**Apicore**" and collectively with RK Pharma, the "**RK Parties**"), on the other hand.

## RECITALS

**WHEREAS**, Endo is engaged in the business of developing, manufacturing, marketing and distributing pharmaceutical products;

**WHEREAS**, the RK Parties are engaged in the business of developing, manufacturing and supplying active pharmaceutical ingredients;

**WHEREAS**, Endo has begun development on the API (as defined below); and

**WHEREAS**, Endo and the RK Parties desire to collaborate on the further development of the API, and to have the RK Parties supply commercial quantities of the API to Endo, subject to the terms and provisions of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises, covenants and agreements hereinafter set forth and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Endo and the RK Parties hereby agree as follows:

## ARTICLE 1.
## DEFINITIONS

Capitalized terms used in this Agreement shall have the following definitions:

"**Affiliate(s)**" means, with respect to each Party, any Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such Party. For purposes of the foregoing definition, "control" (including, with correlative meaning, the terms "controlled by", and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of interests representing equity securities, or partnership interests or by contract, or otherwise, and ownership of more than fifty percent (50%) of such equity securities or partnership interests in a Person shall, without limitation, be deemed to be control for purposes of this definition. For the avoidance of doubt, the RK Parties are Affiliates of each other.

"**Agreement**" has the meaning given to such term in the first paragraph of this Co-Development, License and Supply Agreement.

"**ANDA**" means an abbreviated new drug application pursuant to 21 U.S.C. § 355(j), seeking approval to market a drug product.

"**Anti-Corruption Laws**" has the meaning set forth in Section 11.3.1.

"**API**" means the active pharmaceutical ingredient Ferric Citrate.

"**Apicore**" has the meaning given to such term in the first paragraph of this Agreement.

"**Apicore DMF**" means, collectively, the DMF for the API, which Apicore shall file with the FDA, including such modifications that may be filed from time to time, in each case pursuant to this Agreement.

"**Applicable Laws**" means all laws, rules, regulations and guidelines of any Governmental Authority with jurisdiction over the development, manufacturing, exportation, importation, promotion, marketing, sale or distribution of the API, including specifically all cGMP or similar standards or guidelines of the FDA and compendial guidelines (e.g., United States Pharmacopeia), where applicable, as well as U.S. export control laws and the U.S. Foreign Corrupt Practices Act, in each case to the extent applicable to the performance of a Party's obligations under this Agreement.

**"Authorized Person**" has the meaning set forth in Section 2.2.1.

"**Calendar Quarter**" means a three (3) consecutive month period ending on March 31, June 30, September 30 or December 31.

"**Certificate of Analysis**" means a certificate of analysis that includes information demonstrating the testing and compliance of each lot of API with the Specifications, as certified by Apicore's or RK Pharma's quality assurance personnel, that certifies each lot of API was made in accordance with cGMP.

"**cGCP**" means current good clinical practices as required by the rules, guidelines and regulations of the Regulatory Authorities, as applicable for clinical research and clinical trials.

"**cGLP**" means current good laboratory practices as required by the rules, guidelines and regulations of the Regulatory Authorities, as applicable for nonclinical laboratory studies that support or are intended to support applications to conduct research in humans or to obtain marketing authorization.

"**cGMP**" means current good manufacturing practices as required by the rules, guidelines and regulations of the Regulatory Authorities, as applicable to the manufacture, packaging, handling, storage and control of the API in the Territory.

"**Code**" has the meaning set forth in Section 13.5.

"**Co-Developed Intellectual Property**" means all Intellectual Property that is (i) after the Effective Date conceived, developed, created or reduced to practice by either of the Parties in

conjunction with the other Party, and (ii) related to the API or the Product or useful or necessary for the manufacture, use, sale, offer for sale or import of the API or the Product in the Territory.

"**Commercial Launch**" means the first commercial sale in the Territory of the Product by Endo, or an Affiliate or by a sub-licensee of Endo, as the case may be, to a Third Party.

"**Commercially Reasonable Efforts**" means with respect to each Party, efforts and commitment of resources in accordance with such Party's reasonable business, legal, medical, and scientific judgment that are consistent with the efforts and resources that such Party uses for other products owned by it or to which it has rights, that are of similar market potential and at a similar stage in their life cycle, taking into account the competitiveness of the marketplace, the regulatory structure involved, the profitability of the applicable products and other relevant factors, including technical, legal, scientific, medical, sales performance, and/or marketing factors, including the good faith performance of any associated commitments under this Agreement.

"**Compliance Event**" has the meaning set forth in Section 11.3.4.

"**Confidential Information**" means information of a Party that is disclosed to or obtained by the other Party (including information obtained by a Party as a result of access to the facilities of the other Party) either prior to or during the term of this Agreement, which information (a) is non-public, confidential or proprietary in nature, including trade secrets, financial data, product information, manufacturing methods, market research data, marketing plans, identity of customers, nature and source of raw materials, product formulation and methods of producing, testing and packaging, or (b) relates to the disclosing Party's past, present or future research, development or commercialization activities, in each case including a Party's proprietary information; provided, however, that Confidential Information shall not include information that a Party can demonstrate by written and competent evidence: (i) is in the public domain other than as a result of a wrongful act, fault or negligence of such Party (or any of its Affiliates) with respect to its obligations of confidentiality contained herein; (ii) was known by the receiving Party prior to receipt from the disclosing Party; (iii) has been developed by the receiving Party independent of any Confidential Information of the other Party; or (iv) was subsequently, lawfully and in good faith obtained by the receiving Party on a non-confidential basis from a Third Party that was not under an obligation to treat such information in a confidential manner and had a lawful right to make such disclosure. Without limiting the foregoing, the terms of this Agreement shall constitute "Confidential Information" of each Party hereunder.

"**Control**" means, with respect to any Intellectual Property, possession by a Party of the ability (whether by ownership, license or otherwise) to grant access, rights, title, possession, a license or a sublicense to such Intellectual Property without violating the terms of any Third Party agreement, court order, or other arrangement or legal obligation.

"**Cure Period**" has the meaning set forth in Section 13.2.1.

"**Data Protection Laws**" means all applicable data privacy, data protection, information security and other related laws, rules, regulations that are applicable to Protected Personal Information, including without implied limitation the General Data Protection Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of

natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC.

"**DMF**" means, within the United States, a submission of information about an active pharmaceutical ingredient to the FDA pursuant to 21 C.F.R. § 314.420 that permits the party submitting such information to authorize others to rely on such information in support of a submission, such as an ANDA, to the FDA.

"**Dollar**" or "**$**" means the United States dollar.

"**Effective Date**" has the meaning given to such term in the first paragraph of this Agreement.

"**Endo**" has the meaning given to such term in the first paragraph of this Agreement.

"**Endo Designated Laboratory Facility**" means Endo's designated internal or Third Party laboratory as designated by Endo in writing.

"**Endo Designated Manufacturing Facility**" means Endo's designated internal or Third Party manufacturer's facility as designated by Endo in writing.

"**Endo Intellectual Property**" means all Intellectual Property that is (i) owned or Controlled by Endo or any of its Affiliates as of the Effective Date or thereafter, and (ii) related to the API or the Product or useful or necessary for the manufacture, use, sale, offer for sale or import of the API or the Product in the Territory.

"**Export Control Laws**" means all applicable U.S. laws and regulations relating to (a) economic and trade sanctions and embargoes imposed by the Office of Foreign Assets Control of the U.S. Department of Treasury or (b) the export or re-export of commodities, technologies, or services, including the Export Administration Act of 1979, 24 U.S.C. §§ 2401-2420, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, the International Traffic in Arms Regulations, 22 C.F.R. parts 120-130, the Trading with the Enemy Act, 50 U.S.C. §§ 1 et. seq., the Arms Export Control Act, 22 U.S.C. §§ 2778 and 2779, and the International Boycott Provisions of Section 999 of the U.S. Internal Revenue Code of 1986 (as amended).

"**Facility**" means Apicore's facility located at Block No. 252-253, NH228, Dhobikuwa, Gujarat 391440, India, or such other facility where the API is manufactured.

"**FDA**" means the United States Food and Drug Administration and any successor agency thereto.

"**Force Majeure Event**" has the meaning set forth in Section 15.11.

"**Government Official**" means any (a) officer, employee of a government or any department, agency or instrument of a government; (b) person acting in an official capacity for or on behalf of a government or any department, agency, or instrument of a government; (c) officer or employee of a company or business owned in whole or part by a government; (d) officer or employee of a public international organization such as the World Bank or United Nations; (e)

officer or employee of a political party or any person acting in an official capacity on behalf of a political party; and/or (f) candidate or relative of any candidate for political office.

“**Governmental Authority**” means any court, tribunal, arbitrator, agency, legislative body, commission, official or other instrumentality of (i) any government of any country, or (ii) a federal, state, province, county, city or other political subdivision thereof.

“**Healthcare Professional**” means any member of the medical, pharmacy or nursing professions or any other person who in the ordinary course of his or her professional activities may prescribe, purchase, supply or administer a medicinal product.

“**Initial Term**” has the meaning set forth in Section 13.1.

“**Intellectual Property**” means all of the following, to the extent applicable: (i) patent applications and patents corresponding to any of the foregoing that may grant or may have been granted on any applications, including reissues, re-examinations and extensions and any supplemental protection certificates, or the like; (ii) all know-how, work product, trade secrets, inventions (whether patentable or otherwise), data, processes, techniques, procedures, compositions, devices, methods, formulas, protocols and information, whether patentable or not; (iii) copyrightable works, copyrights and applications, registrations and renewals; (iv) logos, trademarks, service marks, and all applications and registrations relating thereto; (v) other proprietary rights; and (vi) copies and tangible embodiments of any one or more of the foregoing.

“**Key Starting Materials**” means Ferric Chloride.

“**Liabilities**” has the meaning set forth in Section 12.1.

“**Milestone Payment**” has the meaning set forth in Section 6.1.2.

“**Minimum Purchase Amount”** has the meaning set forth in Section 3.3.

**“Objection Notice**” has the meaning set forth in Section 5.5.2.

“**Party**” means Endo, on the one hand, or the RK Parties, on the other hand and “**Parties**” shall mean Endo and the RK Parties.

“**Person**” means an individual, corporation, partnership, limited liability company, firm, association, joint venture, estate, trust, governmental or administrative body or agency, or any other entity.

“**Physical Inspection**” means a visual inspection of the outer packaging of a shipment of API delivered as set forth in Section 5.5.1.

“**Product**” means the finished form pharmaceutical product, Ferric Citrate 210 mg tablet, which contains the API as an active ingredient and is therapeutically equivalent to the Reference Listed Drug.

“**Product Regulatory Filing**” means an ANDA or other regulatory filing filed by Endo or any of its Affiliates for the Product to seek Regulatory Approval by a Regulatory Authority, as such filing may be supplemented and/or amended from time to time.

“**Protected Personal Information**” means information relating to an identified or identifiable natural person that is (i) provided by one Party to the other Party in connection with this Agreement and (ii) protected under Data Protection Laws.

“**Raw Materials**” means any starting material used in the synthesis and/or production of the API.

“**Reference Listed Drug**” means AURYXIA®, 210mg tablets, NDA #205874, owned by Keryx Biopharms.

“**Regulatory Approval**” means the applicable approvals necessary to make the Product or the API (as applicable), including approval of the Product Regulatory Filing, receipt of a completeness assessment for the Apicore DMF, and all applicable product and/or establishment licenses, registrations, permits or other authorizations as may be necessary in connection with the Product or the API (as applicable), and which are necessary for the commercial manufacture, commercialization, use, storage, importation, transport, promotion, pricing, distribution or sale of the Product or the API (as applicable) in the Territory.

“**Regulatory Authorities**” means the Governmental Authorities in the Territory with authority over the manufacture or distribution of a pharmaceutical product in the Territory (including the grant of Regulatory Approvals), including the FDA.

“**Rejection Notice**” has the meaning set forth in Section 5.5.1.

“**Renewal Term**” has the meaning set forth in Section 13.1.

“**Representatives**” has the meaning set forth in Section 10.1.

“**RK Parties**” has the meaning given to such term in the first paragraph of this Agreement.

“**RK Pharma**” has the meaning given to such term in the first paragraph of this Agreement.

“**RK Parties Intellectual Property**” means all Intellectual Property that is (i) owned or Controlled by one of the RK Parties or any of their Affiliates as of the Effective Date or thereafter, and (ii) related to the API or useful or necessary for the manufacture, use, sale, offer for sale or import of the API in the Territory.

“**Specifications**” means, collectively, the manufacturing and standard testing procedures for the API, including all applicable control procedures and analytical test methods contained therein, as set forth on Schedule 1, and as such may be amended, supplemented or otherwise modified from time to time by mutual agreement of both Parties or as otherwise set forth herein.

"**Steering Committee**" shall mean a committee consisting of representatives of the RK Parties and Endo to coordinate and facilitate the communication and decision making regarding the development and regulatory strategies of the API as further set out in Section 2.2.

"**Supply Price**" has the meaning set forth in Section 6.3.1.

"**Tax**" or "**Taxes**" shall mean all taxes, including income, corporation, gross receipts, transfer, excise, property, sales, harmonized sales, use, value-added, license, payroll, withholding, social insurance, employment insurance, employer health, franchise or other governmental taxes, imposed by any Taxing Authority (including any interest, penalties or additional tax attributable thereto).

"**Taxing Authority**" shall mean any Governmental Authority, exercising any authority to impose, regulate or administer the imposition of Taxes.

"**Term**" has the meaning set forth in Section 13.1.

"**Territory**" means the United States.

"**Third Party**" or "**Third Parties**" means any Person other than a Party or its Affiliates.

"**United States**" means the United States of America, and its commonwealths, territories, districts and possessions, including the District of Columbia, Commonwealth of Puerto Rico; and any installation, territory, location or jurisdiction under the purview of the FDA or control of the United States government; and any United States military bases and installations worldwide.

"**Validation Batches**" has the meaning set forth in Section 6.1.1.

## ARTICLE 2.
## API DEVELOPMENT

**2.1 RK Parties' General Obligations**.

2.1.1 Subject to the obligations of Endo and the Steering Committee under this Agreement, the RK Parties shall be solely responsible for and have decision-making authority with respect to the development of the API; provided, that the RK Parties shall permit Endo's involvement in such development, and shall consider Endo's substantive input in the development of the API.

2.1.2 Subject to the obligations of Endo and the Steering Committee under this Agreement, the RK Parties shall be responsible to develop the API and carry out stability studies in accordance with the Specifications and decisions of the Steering Committee, strictly observing Applicable Laws, including cGCP, cGLP and cGMP. The RK Parties shall use Commercially Reasonable Efforts to perform its responsibilities as and within the time frames set forth by the Steering Committee.

2.1.3 The RK Parties shall be responsible for manufacturing the API in accordance with the Specifications; the scale-up of production, methods and facilities for

the supply of commercial amounts of the API; the analytical testing of the API as required by the Specifications; the characterization of any impurities; the validation of API as required by the Regulatory Authorities; stability testing of the API; and all other testing or studies required to support the qualification of the API. The RK Parties shall be responsible, at their cost, for remedying any deficiencies identified by a Regulatory Authority in the API, the Apicore DMF or the Product (to the extent related to the API). The RK Parties shall respond to any such deficiencies identified by a Regulatory Authority (together with any new requirements set forth by a Regulatory Authority) in a timely manner, and in no event shall the RK Parties' response delay Endo's intended commercial launch date for the Product. Without limiting Endo's other remedies, in the event Endo reasonably determines that the RK Parties are unable to timely resolve any deficiency, Endo and its Affiliates shall be released from the purchase requirements of Section 3.2.2 or may terminate this Agreement pursuant to Section 13.2.7.

2.1.4 Without limiting the generality of the foregoing:

(i) The RK Parties shall conduct the sameness studies as described on Schedule 2.1.4 and shall thereafter share their full report with Endo. The sameness studies shall be carried out in labs agreed to and approved by Endo in writing. The RK Parties shall take all actions to ensure the studies pass Endo's regulatory review once the RK Parties' full report is compiled and shared with Endo. All costs and expenses associated with the conduct of the sameness studies shall be borne by the RK Parties.

(ii) After performing the sameness studies as described on Schedule 2.1.4, the RK Parties shall transfer the methods to the Endo Designated Laboratory Facility. Thereafter Endo will perform, or caused to be performed, the same characterizations on Endo's finished Product using the reference listed drug. If the methods are not reproducible by Endo, the RK Parties shall assist and cooperate with Endo to resolve.

2.1.5 The RK Parties shall be solely responsible for and maintain materials, facilities and personnel reasonably necessary and of appropriate skill to fulfill its obligations under this Agreement.

2.1.6 The RK Parties shall conduct release testing (or with the prior written consent of Endo, have such release testing conducted on its behalf by a Third Party) to be submitted to Endo, such release testing shall be performed in accordance with cGMP and at the Regulatory Authority-approved facility.

2.1.7 The RK Parties shall be responsible, at its sole cost and expense, for making all payments to the FDA or any Regulatory Authority required under all Applicable Laws with respect to the API in order to perform their obligations hereunder.

**2.2 Steering Committee**.

2.2.1 Within thirty (30) days after the Effective Date, the RK Parties and Endo shall form a Steering Committee which shall be responsible for organizational objectives, resolution of conflicts and decision making. The Steering Committee shall be composed of three (3) representatives of each Party, with one (1) representative of each Party having the authority required to make decisions of the Steering Committee on behalf of his or her Party (the "**Authorized Person**").

2.2.2 The Steering Committee shall be responsible for:

(i) the decision making regarding the development, procurement and regulatory strategies of the API and in cases where no agreement could be reached on the team level;

(ii) reviewing and discussing the Parties' development progress and manufacturing activities related to the API;

(iii) amicably resolving any disputes between the Parties;

(iv) the discussion of the RK Parties' strategy in lawsuits or other litigation relating to Intellectual Property involving the API;

(v) the discussion of Endo's strategy in lawsuits or other litigation relating to Products;

(vi) the decision making in any other lawsuits or other litigation in connection with the Agreement, including but not limited to quality issues with the API; and

(vii) performing such further tasks and responsibilities that the Parties agree in writing to entrust to the Steering Committee.

2.2.3 The Steering Committee shall meet in person or by telephone or video conference at a frequency to be determined by the members of the Steering Committee; however, a first meeting shall take place within sixty (60) days after the Effective Date. Meetings in person shall alternate between RK Pharma's and Endo's offices. The Steering Committee may, at its sole discretion, invite additional representatives of the Parties to attend meetings of the Steering Committee in an observer role or as a contributor when appropriate. Each Party shall bear its own costs in relation to meetings of the Steering Committee.

2.2.4 The chair of the Steering Committee shall alternate each year between a representative from the RK Parties and Endo. The agenda for a meeting shall be drafted by the chairperson and shall be distributed no later than fifteen (15) days prior to the meeting.

2.2.5 All decisions of the Steering Committee shall be made by unanimous vote of the Authorized Persons. In order to achieve a quorum for any meeting of the Steering Committee, both Authorized Persons shall be in attendance at such meeting.

2.2.6 Within fifteen (15) days after each meeting, the chairperson shall send draft minutes of the meeting to the other Party. Such minutes shall in particular document all decisions taken in the meeting. Each Party shall provide comments, if any, to such draft minutes as soon as practicable, at the latest until the next meeting in which all Parties shall discuss any such comments and come to an agreement on the minutes. The agreed minutes shall be signed by the chairperson and sent to the other Party for countersignature.

2.2.7 Decisions of the Steering Committee properly made and documented in accordance with this Section 2.2 shall be binding on both Parties.

## ARTICLE 3.
## EXCLUSIVITY

**3.1 Co-Development**. The RK Parties and Endo and their respective Affiliates shall exclusively cooperate in the development and commercialization of the API within the Territory.

**3.2 Exclusivity**.

3.2.1 Unless otherwise agreed between the Parties in this Agreement, neither of the RK Parties, nor any of their Affiliates:

(i) shall grant any rights to or out-license to any Third Parties any Intellectual Property for the development, manufacturing or commercialization of the API, including, without limitation, granting rights to make, use or sell the API in the Territory; or

(ii) shall, directly or indirectly, develop, manufacture, market, sell or otherwise commercialize the API in the Territory, except as expressly provided in this Agreement.

3.2.2 Unless otherwise agreed between the Parties in this Agreement, Endo and its Affiliates shall purchase at least one hundred percent (100%) of their annual requirements of the API in the Territory.

**3.3 Minimum Purchase Amount**. The exclusivity obligations under Section 3.2.1 shall apply solely during the Term and solely to the extent that Endo purchases from the RK Parties or their Affiliates at least 1,000 kg of API (the "**Minimum Purchase Amount**") per calendar year during the Term beginning with the year of Commercial Launch. In the event that Endo does not purchase at least the Minimum Purchase Amount in any calendar year following Commercial Launch, and there has not been any deficiencies identified by a Regulatory Authority in the API, the Apicore DMF or the Product, then thereafter the Parties' obligations in Section 3.2 shall be of no further force or effect.

**3.4 Outside Territory**. The Parties acknowledge and agree that both Parties shall be free to develop, seek regulatory approval for, manufacture, use and commercialize, directly or indirectly, the API outside of the Territory.