# EXHIBIT 1 (c)

DocuSign Envelope ID: 380537DB-A104-4DB9-9D7D-FF8B93C35523

Pharma to the appropriate Governmental Authority, and Endo will furnish RK Pharma with official receipts evidencing the payment of such Tax. Any such Tax required to be withheld will be treated as having been paid to RK Pharma for all purposes of this Agreement. Notwithstanding the foregoing, prior to deducting or withholding any amounts from any payment hereunder in respect of Taxes, Endo will use commercially reasonable efforts to give advance notice to RK Pharma and take such steps as RK Pharma may reasonably request and otherwise cooperate with RK Pharma to reduce or eliminate such deduction or withholding, including by reasonably cooperating in order to execute and file any forms or certificates reasonably required to claim an available reduced rate of, or exemption from, withholding Taxes. For the avoidance of doubt, all payments by Endo hereunder shall be made to RK Pharma and not Apicore.

## ARTICLE 7.
## MANUFACTURING STANDARDS AND RECALLS

**7.1 Manufacturing Standards**. Each of the RK Parties hereby represents, warrants and covenants that:

7.1.1 all API that is manufactured, stored, handled, supplied and delivered to Endo shall (i) conform to the Specifications through the remaining shelf life of the API, the applicable Product Regulatory Filing, the Apicore DMF, cGMP, all applicable compendial specifications (e.g., the United States Pharmacopeia), and with all Applicable Laws relating to the API, and (ii) be manufactured, packaged, tested, stored and handled in accordance with the then-current version of the applicable Product Regulatory Filing;

7.1.2 at the time of delivery in accordance with Section 5.4, all API shall have a minimum shelf life of at least seventy-five percent (75%) of its original shelf life for any commercial quantities of the API sold hereunder; provided that, the RK Parties shall use their reasonable best efforts to deliver API with minimum shelf life of at least eighty-five percent (85%) of its original shelf life;

7.1.3 all API supplied by the RK Parties hereunder will be transferred to Endo free and clear of all liens, title claims, encumbrances, and security interests;

7.1.4 the RK Parties and their Affiliates and subcontractors, shall have complied with all Applicable Laws in the conduct of all activities associated with the development, manufacture and supply of the API, transfer and validation of the manufacturing process, microbial test methods, and analytical test methods relating to the API, it being acknowledged and agreed that the RK Parties shall at all times be and remain fully responsible to Endo for all activities (actions or inactions) of any such contractor that either of the RK Parties may employ or engage as if the RK Parties had conducted such activities themselves; and

7.1.5 All deliveries of API by the RK Parties will be accompanied by all documentation required under Applicable Law and applicable Regulatory Approvals in order for Endo to release, market and sell the applicable Product in the Territory, including a Certificate of Analysis.

7.1.6 For the avoidance of doubt, all of the foregoing representations and warranties shall apply to the Validation Batches.

**7.2 Recall**. In the event that any recall of the Product shall be required by Regulatory Authorities, or Endo voluntarily determines to recall the Product or take any other market withdrawal action with respect to the Product, Endo shall conduct the recall or market withdrawal and be responsible for the overall management of such recall or market withdrawal, including dealing with Governmental Authorities and Regulatory Authorities with respect thereto. Endo shall be responsible for all recall or market withdrawal expenses, except to the extent such recall or market withdrawal results from a breach of this Agreement by the RK Parties or relates to API manufactured by the RK Parties not in accordance with the terms hereof, in which event the RK Parties, jointly and severally, shall reimburse Endo for all costs and expenses incurred by Endo or its Affiliates in connection with such recall or market withdrawal to the extent attributable to such breach or manufacture by the RK Parties.

**7.3 Access**. Endo shall have the right, exercisable upon two (2) days prior written notice to RK Pharma, to designate one or more representatives of Endo to be present at the Facility during Apicore's business hours to observe the manufacturing of the API under this Agreement and the RK Parties' performance of their other obligations under this Agreement. While at the Facility, such representative(s) of Endo shall (a) have access to provide any guidance to the RK Parties in connection with the manufacturing of the API and performance of such obligations, (b) be restricted to such areas as are directly relevant to the manufacture of API and such other areas as may be otherwise authorized by the RK Parties, (c) shall comply with all applicable written policies and procedures provided in advance by the RK Parties to Endo, and (d) may, at the RK Parties' option, be escorted by RK Pharma or Apicore personnel. Such representative(s) shall be bound by the confidentiality provisions in this Agreement.

**7.4 Quality Technical Agreement**. Endo and the RK Parties shall enter into a Quality Technical Agreement within ninety (90) days of the Effective Date. Endo shall provide the initial draft of this agreement.

## ARTICLE 8.
## AUDITS AND INSPECTION RIGHTS

**8.1 Inspections by Governmental Authorities**. During the Term, the RK Parties shall (i) advise Endo of any Governmental Authority visits to, or written inquiries about, any facilities or procedures for the manufacture, storage, or handling of the API within two (2) business days after notice of such visit or receipt of inquiry (or if no advance notice is given, then within forty-eight (48) hours after occurrence of such visit or inquiry), and (ii) furnish Endo with copies of any report or correspondence issued by or provided to any Governmental Authority in connection with such visit or inquiry and reasonably related to the API, and the RK Parties shall consider in good faith any recommendations made by Endo in connection therewith prior to responding to the applicable Governmental Authority. The RK Parties shall furnish a summary of the interaction with such Governmental Authority to Endo within five (5) business days after receipt of any such report or correspondence issued by or provided to the Governmental Authority in connection with such visit or inquiry. the RK Parties shall permit the relevant Governmental Authorities to inspect its facilities and records in connection with the activities contemplated by this Agreement with

DocuSign Envelope ID: 380537DB-A104-4DB9-9D7D-FF8B93C35523

assistance of Endo.

**8.2 Inspections by Endo**. The RK Parties shall permit Endo, or cause Endo to be permitted, to inspect the applicable manufacturing and/or testing facilities for API during business hours, provided that Endo provides thirty (30) days' prior written notice to RK Pharma (or, in the event of a Governmental Authority visit or inspection, such shorter period of notice as appropriate under the circumstances). During any such inspection, the RK Parties shall permit Endo (or its authorized representative), or cause Endo (or such representative) to be permitted, (i) to inspect the manufacturing facilities, (ii) to inspect the quality control procedures, and/or (iii) to review any records and reports pertinent to the manufacture, disposition or transport of API as may be necessary to evidence compliance with this Agreement and/or all applicable regulations in connection with activities associated with the API, including compliance with cGMP.

## ARTICLE 9.
## INTELLECTUAL PROPERTY

**9.1 Ownership**. Except as explicitly provided for in this Agreement, each Party shall own its own Intellectual Property consistent with United States, Indian or other applicable international patent, trademark, and copyright law.

9.1.1 The RK Parties hereby acknowledge and agree that Endo or its Affiliate, as applicable, is the sole and exclusive owner of the Endo Intellectual Property, the Product Regulatory Filings and the Co-Developed Intellectual Property associated with the Product. Each of the RK Parties hereby assigns, conveys and transfers to Endo its right, title and interest in and to any Co-Developed Intellectual Property associated with the Product. Each of the RK Parties agrees to execute, or to have executed, at Endo's cost and expense (without, however, any further payment of consideration to the RK Parties), any additional documents necessary to establish, evidence, maintain or protect Endo's rights hereunder.

9.1.2 Endo hereby acknowledges and agrees that one of the RK Parties or one of their Affiliates, as applicable, is the sole and exclusive owner of the RK Parties Intellectual Property, the Apicore DMF and the Co-Developed Intellectual Property associated with the API. Each of the RK Parties hereby grants an exclusive, royalty-free, sublicensable license in the Territory to Endo to any Co-Developed Intellectual Property related to the API. Endo hereby assigns, conveys and transfers to the RK Parties its right, title and interest in and to any Co-Developed Intellectual Property associated with the API. Endo agrees to execute, or to have executed, at the RK Parties' cost and expense (without, however, any payment of consideration to Endo), any additional documents necessary to establish, evidence, maintain or protect the RK Parties' rights hereunder.

9.1.3 Each Party that owns any particular Intellectual Property shall, as between the Parties, have the sole and exclusive right to control the filing for, prosecution, maintenance and enforcement of such Intellectual Property in its sole discretion.

**9.2 Notification**. The Parties shall promptly notify each other of any allegation that any activity undertaken pursuant to this Agreement infringes or may infringe the intellectual property

rights of any Third Party. Each Party shall assist and cooperate with the other Party in the defense of any suit, action or claim relating to the Product (including consenting to being named as a nominal party thereto).

**9.3 Licenses**

9.3.1 Each of the RK Parties hereby grants to Endo and its Affiliates a non-exclusive, royalty-free, sublicensable license in the Territory during the Term, under the RK Parties Intellectual Property and the Apicore DMF to the extent related to the Product as necessary to prepare, submit, and prosecute the Product Regulatory Filing and to make, have made, import, have imported, market, have marketed, promote, have promoted, distribute, have distributed, use, sell and have sold the Product in the Territory.

9.3.2 Endo hereby grants to the RK Parties the non-exclusive, non-sublicensable, non-transferable right and license in, to and under the Co-Developed Intellectual Property related to the Product in the Territory during the Term, solely to the extent necessary to perform their obligations hereunder. The RK Parties shall authorize Endo to reference the Apicore DMF in the Product Regulatory Filing through a letter of authorization.

**9.4 Intellectual Property, Regulatory and Litigation.**

9.4.1 Endo or its Affiliate shall be responsible for managing all matters related to the Product involving Regulatory Authority citizen's petitions or Regulatory Authority decisions concerning the Product or competitive products and Third Party patent rights, including defending patent litigation based on a Paragraph IV certification made by Endo or an Affiliate in respect of the Product ("**Paragraph IV Litigation**"). Endo shall control and manage such matters in its discretion and at its expense, using counsel of its choice.

9.4.2 In connection with any Paragraph IV Litigation, Endo shall be entitled to settle or compromise any claim resulting therefrom, and to enter into any agreement in respect thereof, without the RK Parties or the consent of the RK Parties so long as said settlement or compromise does not (i) enjoin or similarly restrain the RK Parties' operations; or (ii) diminish the RK Parties' reasonably anticipated future consideration under this Agreement.

## ARTICLE 10.
## CONFIDENTIALITY AND PUBLIC DISCLOSURE

**10.1 Treatment of Confidential Information**. Each Party shall retain in strict confidence and not to disclose, divulge or otherwise communicate to any other Person any Confidential Information of the other Party, whether received prior to or after the Effective Date, and shall not to use any such Confidential Information for any purpose, except pursuant to the terms of, and as required to carry out such Party's obligations, under this Agreement; provided, however, that each Party may disclose Confidential Information of the other Party to the officers, directors, employees, agents, accountants, attorneys, consultants, subcontractors or other representatives of the receiving Party or its Affiliates (the "**Representatives**"), who, in each case, (a) need to know such Confidential Information for purposes of the implementation and performance by the receiving Party of this Agreement, (b) will use the Confidential Information

only for such limited purposes, and (c) are bound by confidentiality obligations no less protective than those set forth in this Agreement.

10.1.1 Each Party shall use at least the same standard of care in complying with its confidentiality obligations hereunder as it uses to protect its own Confidential Information of comparable sensitivity and to prevent and restrain the unauthorized disclosure of such Confidential Information by any of its Representatives, but no less than a reasonable standard of care. The Party receiving Confidential Information hereunder shall be jointly and severally liable for any breach by any of its Representatives of the restrictions set forth in this Agreement.

10.1.2 Without limiting the generality of any of the foregoing, the Parties shall not make any disclosure of Confidential Information that would be reasonably likely to impair the Parties' ability to obtain U.S. or foreign patents on any patentable invention or discovery described or otherwise embodied in such Confidential Information.

**10.2 Release from Restrictions.**

10.2.1 Each Party may disclose Confidential Information to the extent that such Confidential Information disclosure is made in response to a valid order of a court of competent jurisdiction or other Governmental Authority or otherwise required by law, in the opinion of counsel to the Party that has received Confidential Information of the other Party; provided, however, that such receiving Party shall immediately give as much advance notice as feasible to the Party that has disclosed such Confidential Information hereunder to give such disclosing Party a reasonable opportunity to quash such order or to obtain a protective order requiring that the Confidential Information or documents that are the subject of such order be held in confidence by such court or Governmental Authority or, if disclosed, be used only for the purposes for which the order was issued; and provided further that regardless of whether a disclosure order is quashed or a protective order is obtained, the Confidential Information disclosed in response to such court or Governmental Authority order shall be limited to that information legally required to be disclosed in response to such court or governmental order; and provided further, such Party shall, to the extent reasonably practicable, provide the other Party with a copy of the proposed text of such statement or disclosure (including all exhibits) sufficiently in advance of the scheduled release or publication thereof to afford such other Party a reasonable opportunity to review and comment upon the proposed text. Additionally, Endo may disclose Confidential Information to the extent such disclosure is made to (a) a Governmental Authority as required in connection with any filing, application or request for Regulatory Approval with respect to the Product or the API or (b) a Third Party to which Endo has a contractual obligation related to the Product or the API and only to the extent such information is required by such contractual obligation; provided, however, that in each case ((a) and (b)), reasonable measures shall be taken to assure confidential treatment of such information.

10.2.2 A Party may disclose this Agreement to a Third Party in connection with or in conjunction with a proposed merger, consolidation, sale of assets that include those related to this Agreement, a permitted assignment of this Agreement or loan financing,

raising of capital, or sale of securities, provided the disclosing Party obtains an agreement for confidential treatment thereof on terms no less protective than those contained herein.

**10.3 Notification**. The receiving Party shall notify the disclosing Party promptly upon discovery of any unauthorized use or disclosure of the disclosing Party's Confidential Information, and will cooperate with the disclosing Party in any reasonably requested fashion to assist the disclosing Party to regain possession of such Confidential Information and to prevent its further use or disclosure.

**10.4 No Implied Rights**. Except as otherwise set forth in this Agreement, nothing herein shall be construed as giving either Party any right, title, interest in or ownership of the Confidential Information or Intellectual Property of the other Party. For the purposes of this Agreement, specific information disclosed as part of Confidential Information shall not be deemed to be in the public domain or in the prior possession of the receiving Party merely because it is embraced by more general information in the public domain or by more general information in the prior possession of the receiving Party.

**10.5 Survival of Confidentiality Obligations**. The confidentiality obligations of the Parties contained in this Article 10 shall remain binding on both Parties following expiration or the termination of this Agreement, regardless of the cause of such expiration or termination, for fifteen (15) years after expiration or termination, which may be extended for one or more additional five (5) year periods by mutual agreement of the Parties (such agreement not to be unreasonably withheld).

**10.6 Public Announcement**. No press release, public announcement, confirmation or other communication to the public or Third Parties regarding the existence or terms of this Agreement or related matters shall be made by either Party without the prior written consent of the other Party, including with respect to the form, content and timing of such press release, public announcement, confirmation or other communication to the public or Third Parties.

**10.7 Third Party Information.**

10.7.1 The RK Parties shall not (i) violate or misappropriate the trade secrets, know-how, confidential information or knowingly violate or misappropriate any other proprietary rights of any Third Party in developing or manufacturing the API, and will not communicate any Third Party trade secrets to Endo in connection with its rights and obligations under this Agreement without receiving permission from such Third Party and informing Endo of communication of such trade secrets or (ii) provide or disclose any documents or information to Endo unless it is the owner thereof, or otherwise has the full and legal right to do so.

10.7.2 Endo shall not (i) violate or misappropriate the trade secrets, know-how, confidential information or knowingly violate or misappropriate any other proprietary rights of any Third Party in developing or manufacturing the Product, and will not communicate any Third Party trade secrets to the RK Parties in connection with its rights and obligations under this Agreement without receiving permission from such Third Party and informing the RK Parties of communication of such trade secrets or (ii) provide or

disclose any documents or information to the RK Parties unless one is the owner thereof, or otherwise has the full and legal right to do so.

**10.8 Return of Confidential Information**. Upon termination or expiration of this Agreement, or upon written request of the disclosing Party, the receiving Party shall promptly return or destroy all documents, notes and other tangible materials representing the disclosing Party's Confidential Information and all copies thereof.

**10.9 Remedies**. Each Party acknowledges and agrees that: (a) it will be impossible to measure the damages that would be suffered by the other Party if such Party fails to comply with the obligations set forth in this Article 10 and that, in the event of any such failure, the other Party will be irreparably harmed and will not have an adequate remedy at law; (b) the other Party shall, therefore, be entitled, in addition to any other rights and remedies, to seek specific performance of such Party's obligations and to obtain immediate injunctive relief without having to post a bond; and (c) such Party shall not assert, as a defense to any proceeding for such specific performance or injunctive relief, that the other Party will not be irreparably harmed or that the other Party has an adequate remedy at law.

## ARTICLE 11.
## REPRESENTATIONS AND WARRANTIES

**11.1 RK Parties Representations**. Each of the RK Parties hereby represents, warrants and covenants that:

11.1.1 it has the corporate or company power and authority to enter into and be bound by the terms and conditions of this Agreement and to perform its obligations hereunder and to execute this Agreement on behalf of itself and its Affiliates and to so bind itself and its Affiliates to the terms and conditions of this Agreement;

11.1.2 it has taken all necessary action on its part to authorize the execution and delivery of this Agreement, and this Agreement has been duly executed and delivered on behalf of it and its Affiliates and constitutes a legal, valid, binding obligation, enforceable against it and its Affiliates in accordance with its terms, subject to the effects of bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditor rights and judicial principles affecting the availability of specific performance and general principles of equity, whether enforceability is considered a proceeding at law or equity;

11.1.3 it is subject to no legal, contractual or other restrictions, limitations or conditions that conflict with its rights and obligations under this Agreement or that would reasonably be expected to affect adversely its ability to perform its obligations hereunder;

11.1.4 there is no claim, action, suit, proceeding or investigation pending or threatened against or affecting the transaction contemplated hereby;

11.1.5 the RK Parties are the owners of the entire right, title and interest in the RK Parties Intellectual Property;

DocuSign Envelope ID: 380537DB-A104-4DB9-9D7D-FF8B93C35523

11.1.6 it has not violated or misappropriated, and will not violate or misappropriate, the trade secrets, know-how, or Confidential Information of any Third Party in developing or manufacturing of the API; and

11.1.7 neither it nor any of its Affiliates or subcontractors (a) has been debarred by a Regulatory Authority, (b) is subject to debarment by a Regulatory Authority or (c) will use, in any capacity, in connection with the activities to be performed under this Agreement, any Person who or that has been debarred, or is the subject of debarment proceedings by any Regulatory Authority; and if it learns that a Person performing on its behalf under this Agreement has been debarred by any Regulatory Authority, or has become the subject of debarment proceedings by any Regulatory Authority, it shall so promptly notify Endo and shall prohibit such Person from performing on its behalf under this Agreement.

**11.2 Endo Representations**. Endo hereby represents, warrants and covenants that:

11.2.1 Endo has the corporate power and authority to enter into and be bound by the terms and conditions of this Agreement and to perform its obligations hereunder and to execute this Agreement on behalf of itself and its Affiliates and to so bind itself and its Affiliates to the terms and conditions of this Agreement;

11.2.2 Endo has taken all necessary action on its part to authorize the execution and delivery of this Agreement, and this Agreement has been duly executed and delivered on behalf of Endo and its Affiliates and constitutes a legal, valid, binding obligation, enforceable against Endo and its Affiliates in accordance with its terms, subject to the effects of bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditor rights and judicial principles affecting the availability of specific performance and general principles of equity, whether enforceability is considered a proceeding at law or equity;

11.2.3 Endo is subject to no legal, contractual or other restrictions, limitations or conditions that conflict with its rights and obligations under this Agreement or that would reasonably be expected to affect adversely its ability to perform hereunder; and

11.2.4 there is no claim, action, suit, proceeding or investigation pending or threatened against or affecting the transaction contemplated hereby.

**11.3 Compliance with Laws.**

11.3.1 **Anti-Corruption Laws**. Each Party represents and warrants to the other Party that, to the knowledge of such Party, such Party, with respect to the conduct of its business as of the Effective Date, has been and is in compliance in all material respects with all Applicable Laws. Each Party shall comply, and shall cause its employees and subcontractors to comply, with all Applicable Laws in its performance of activities contemplated under this Agreement. Without limiting the generality of the foregoing, each Party agrees that it will comply with, and will not take any action that will cause the other Party or its Affiliates to be in breach of all Applicable Laws for the prevention of fraud, kickbacks, bribery, corruption, racketeering, money laundering or terrorism, including the