# EXHIBIT 1 (d)

FCPA, each, as amended from time to time (collectively, "**Anti-Corruption Laws**"). Each Party agrees that it has not, and covenants it will not, in connection with the performance of this Agreement, give, promise, authorize, ratify or offer, or take any act in furtherance of offering or giving anything of value, directly or indirectly: (i) to any individual, including Government Officials; or (ii) to an intermediary for payment to any individual, including Government Officials; (iii) or to any sick fund, health insurer or Healthcare Professional or employee or officer of such sick fund, health insurer or Healthcare Professional; or (iv) to any political party. It is the intent of the Parties that no payments or transfers of value shall be made, promised, authorized, ratified or offered with the purpose or effect of public or commercial bribery, acceptance or acquiescence in extortion, kickbacks or other unlawful or improper means of securing an improper advantage or obtaining or retaining business.

11.3.2 **Data Protection Laws**. Each Party represents and warrants that it will comply (and will cause its agents, accountants, attorneys, consultants, subcontractors and other representatives to comply) with all applicable Data Protection Laws and Exhibit A to this Agreement.

11.3.3 **OFAC Compliance**. Each Party acknowledges and expressly agrees that certain laws of the United States of America and other countries, including the United States Export Control Regulations, the United States Anti-Money Laundering laws, the United States Anti-Terrorism laws and the FCPA, and U.S. sanctions programs administered by the Office of Foreign Assets Control and the Bureau of Industry and Security, among others, may result in the imposition of sanctions on the other Party or its Affiliates in the event that, directly or indirectly, products are exported to or imported from, or payments are sent to or received from various countries or regions, including Iran, North Korea, Syria, Sudan, the Crimea region of Ukraine, or any country embargoed by Executive Order or otherwise, or to or from certain individuals designated or identified as sanctioned by the U.S. government, including persons in Russia and Ukraine.

11.3.4 **Compliance Event Reporting**. Each Party agrees that if it learns of any violation of Data Protection Laws, Applicable Laws, Export Control Laws or Anti-Corruption Laws by an employee or sub-contractor that performs any function under this Agreement (a "**Compliance Event**"), it will immediately notify the other Party in writing of such Compliance Event and the measures it has taken and intends to take to remedy such Compliance Event and to prevent its recurrence.

## ARTICLE 12.
## INDEMNIFICATION

**12.1 Endo Indemnification by RK Parties**. Subject to Section 12.3, the RK Parties shall, jointly and severally, defend, indemnify and hold harmless each of Endo and its Affiliates, and each of their respective directors, officers and employees, from and against any and all liabilities, damages, settlements, investigations, penalties, fines, costs or expenses, including reasonable attorneys' fees and other expenses of litigation (collectively, "**Liabilities**"), arising out of or in connection with Third Party claims, suits, actions, demands or judgments to the extent relating to or arising out of (i) any breach by either of the RK Parties of any representation,

DocuSign Envelope ID: 380537DB-A104-4DB9-9D7D-FF8B93C35523

warranty, undertaking, covenant or obligation under this Agreement, (ii) any negligence, gross negligence or willful misconduct by either of the RK Parties, their Affiliates or their Representatives, or (iii) any API not manufactured and supplied in accordance with the terms hereof, except in each case (clause (i), (ii) or (iii)), to the extent that such Liabilities are subject to indemnification by Endo under Section 12.2.

**12.2 RK Parties Indemnification by Endo**. Subject to Section 12.3, Endo shall defend, indemnify and hold harmless the RK Parties and their Affiliates, and each of their respective directors, officers and employees, from and against any and all Liabilities arising out of or in connection with Third Party claims, suits, actions, demands or judgments to the extent relating to or arising out of (i) the promotion, distribution and marketing of the Product by Endo, (ii) any breach by Endo of any representation, warranty, undertaking or covenant under this Agreement or (iii) any negligence, gross negligence or willful misconduct by Endo or its Affiliates or its Representatives, except in each case (clause (i), (ii) or (iii)), to the extent that such Liabilities are subject to indemnification by the RK Parties under Section 12.1.

**12.3 Notice and Procedures; Settlement.**

12.3.1 Each indemnified Party under this Agreement shall give the indemnifying Party prompt written notice of any claim it receives, including all particulars of such claim(s) to the extent known to the indemnified Party; provided, however, that the failure to give timely notice to the indemnifying Party as contemplated hereby shall not release the indemnifying Party from any liability to the indemnified Party, except to the extent the indemnifying Party is materially prejudiced in defending any claim by such failure. The indemnified Party shall also give the indemnifying Party the opportunity to assume sole and full control of the defense and settlement of all claims for which it is seeking indemnification. If the indemnifying Party assumes such control and defends against the Liabilities, it shall not be responsible for the legal fees of any attorneys additionally employed by the indemnified Party at its election. If the indemnifying Party refuses to defend, it shall remain liable for the legal fees of any attorneys additionally employed by the indemnified Party. If the indemnifying Party is not given opportunity to assume sole and full control of the defense and settlement, then it shall have no liability of the purported indemnified Party for the associated claim, whether for attorney's fees, costs, expenses or other Liabilities. The Party not assuming the defense of any such claim shall render all reasonable assistance to the Party assuming such defense.

12.3.2 Except in case the indemnifying Party refuses to fully defend and hold harmless the indemnified Party against subject losses, in no event shall the indemnified Party be entitled to settle claims subject to indemnification under this Article 12 without the consent of the indemnifying Party. The indemnifying Party may settle any claim under this Article 12 on behalf of the indemnified Party without the consent of the indemnified Party so long as the indemnified Party is not required to make any payments not covered by the indemnifying Party or to admit to any fault or wrongdoing.

## ARTICLE 13.
## TERM AND TERMINATION

**13.1 Term**. Unless earlier terminated pursuant to this Article 13, the initial term of this Agreement shall continue in force from the Effective Date for a period of five (5) years (the "**Initial Term**"). Thereafter, this Agreement shall automatically renew for successive renewal terms of one (1) year each (each a "**Renewal Term**"), unless either Party gives the other Party one hundred eighty (180) days' prior written notice of non-renewal prior to the end of the Initial Term or Renewal Term, as applicable. The Initial Term plus the Renewal Term(s), if any, is referred to herein as the "**Term**".

**13.2 Termination**. This Agreement may be terminated:

13.2.1 By either Party in the event that the other Party commits a material breach of this Agreement and such breach shall not have been cured within sixty (60) days after the giving of notice of such material breach, or such extended period in the event such breach cannot be cured within sixty (60) days but such breaching Party has commenced efforts to cure such breach in a diligent manner (such period, as applicable, a "**Cure Period**"), in which case such termination will be effective immediately upon delivery after such Cure Period of written notice of termination by the non-breaching Party to the breaching Party;

13.2.2 By either Party immediately upon written notice, if the other Party at any time commences a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law or seeking the appointment of a trustee, receiver, liquidator, custodian or similar official of it or of any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall take any corporate action to authorize any of the foregoing;

13.2.3 By either Party immediately upon written notice, if the other Party at any time has an involuntary case or other proceeding commenced against it seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of ninety (90) days; or an order for relief is entered against such Party under applicable bankruptcy laws;

13.2.4 By either Party upon thirty (30) days' notice to the other Party if the other Party at any time is insolvent or is generally unable to pay its debts as they become due;

13.2.5 By Endo pursuant to Section 5.6.1;

13.2.6 By Endo upon ninety (90) days' written notice, if Endo determines, in its sole discretion, that Product is not commercially viable;

13.2.7 By Endo, immediately upon written notice, if Endo reasonably determines any of the following has occurred: (i) the sameness studies have not been successfully completed by the RK Parties to Endo's reasonable satisfaction and in accordance with the criteria set forth on Schedule 2.1.4 by April 30, 2022; (ii) the RK Parties manufactured Validation Batches which do not conform to the Specifications; or (iii) an unresolvable FDA deficiency with respect to the API, the Apicore DMF or the Product (to the extent related to the API);

13.2.8 By Endo if either of the RK Parties or any of their Affiliates receives an FDA Notice of Adverse Findings, a warning letter, or other written correspondence from any Regulatory Authority, in each case, asserting that the operations with respect to the Facility and/or the API were not in compliance with Applicable Laws and which would prevent manufacture of the API by the RK Parties or a Product by Endo for a period of more than one hundred and eighty days (180) days; provided that, at Endo's option, in lieu of termination, Endo and its Affiliates shall be released from the purchase requirements of Section 3.2.2;

13.2.9 By either Party upon notice to the other Party if the other Party violates Section 11.3; or

13.2.10 By either Party pursuant to Section 15.11

**13.3 Effect of Termination**.

13.3.1 Termination of this Agreement for any reason shall be without prejudice to any legal, equitable, or administrative remedies as to which either Party is or may become entitled.

13.3.2 If the event this Agreement is terminated by Endo pursuant to Section 13.2.7, the RK Parties shall refund to Endo the Milestone Payment within thirty (30) days of such termination.

**13.4 Survival**. Articles 1, 10, 12, 14 and 15, and Sections 5.6.2, 9.1, 13.3, 13.4, 13.5, and any other provisions necessary and proper to give effect to the intention of the Parties as to the effect of this Agreement after termination shall survive any expiration of the Term or termination of this Agreement. In addition, unless otherwise expressly set forth herein, no expiration of the Term or termination of this Agreement shall have any effect on any payment or other obligation accruing or arising prior to such expiration or termination, including any damages arising from any breach hereunder.

**13.5 Intellectual Property.** All licenses and rights to licenses granted under or pursuant to this Agreement are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code (the "**Code**"), licenses of rights to "intellectual property" as defined under Section 101(35A) of the Code. Endo, as the licensee of such rights under this Agreement, shall retain and may fully exercise all of its rights and elections under the Code, and upon commencement of a bankruptcy proceeding by or against either RK Party under the Code, shall be entitled to a complete duplicate of, or complete access to (as Endo deems appropriate), any such intellectual property and all embodiments of such intellectual property. Such intellectual

property and all embodiments thereof shall be promptly delivered to Endo (a) upon any such commencement of a bankruptcy proceeding upon written request therefor by Endo, unless the applicable RK Party elects to continue to perform all of its obligations under this Agreement or (b) if not delivered under (a) above, upon the rejection of this Agreement by or on behalf of an RK Party, upon written request therefor by Endo, and each Party hereby acknowledges and agrees that the foregoing shall serve as its consent to such transfer of the intellectual property and all embodiments thereof. The foregoing provisions of this Section 13.5 are without prejudice to any rights Endo may have arising under the Code or other applicable law.

## ARTICLE 14.
## INSURANCE

**14.1 Insurance**.

14.1.1 Each Party shall, at its own cost and expense, obtain and maintain in full force and effect at all times during the Term, and for a period of three (3) years thereafter:

(i) commercial general liability insurance covering bodily injury and property damage with limits of Two Million U.S. Dollars ($2,000,000) per occurrence and Five Million U.S. Dollars ($5,000,000) in the aggregate;

(ii) products and completed operations liability insurance with limits of (i) Two Million U.S. Dollars ($2,000,000) per occurrence and Ten Million U.S. Dollars ($10,000,000) in the aggregate; and

(iii) workers compensation with statutory limits as required by law and employers liability insurance with a limit of One Million U.S. Dollars ($1,000,000) per accident.

14.1.2 All of the foregoing insurance policies shall be obtained from an insurance carrier or carriers having a current A.M. Best rating of at least A- Class VIII.

14.1.3 Upon execution of this Agreement and annually thereafter, each Party shall provide to the other Party, upon request, with a certificate of insurance evidencing such coverage and naming such other Party and its Affiliates as additional insureds. Each Party shall provide the other Parties with written notice within thirty (30) days of any material change in the terms or coverage of such insurance policies or their lapse, cancellation or termination.

14.1.4 All insurance policies obtained by a Party pursuant to this Agreement shall be primary and not contributing to any other insurance, self-insurance or captive insurance maintained by the other Party to the extent of such Party’s indemnification obligations hereunder; provided, however, that notwithstanding the foregoing, the insurance policies required under this Article 14 shall not be construed to limit a Party’s liability with respect to its indemnification obligations under this Agreement.

DocuSign Envelope ID: 380537DB-A104-4DB9-9D7D-FF8B93C35523

## ARTICLE 15.
## MISCELLANEOUS

**15.1 Interpretation and Construction**. Unless the context of this Agreement otherwise requires, (i) the terms "include," "includes," or "including" shall be deemed to be followed by the words "without limitation" unless otherwise indicated; (ii) words using the singular or plural number shall also include the other; (iii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement; and (iv) the terms "Article," "Section", "Schedule" and "Exhibit" refer to the specified Article, Section, Schedule and Exhibit of this Agreement. Unless otherwise expressly provided in this Agreement, the term "shall be responsible for" or the like, shall be deemed to be followed by "and shall be obligated to duly carry out such responsibility." Whenever this Agreement refers to a number of days, unless otherwise specified, such number shall refer to calendar days. The headings and paragraph captions in this Agreement are for reference and convenience purposes only and shall not affect the meaning or interpretation of this Agreement. This Agreement shall not be interpreted or constructed in favor of or against either Party because of its effort in preparing it.

**15.2 Independent Contractor Status**. It is understood and agreed that nothing in this Agreement nor any agreements related hereto is intended to nor shall create a partnership between the Parties. The Parties hereto are independent contractors and are engaged in the operation of their own respective businesses, and neither Party hereto is to be considered the agent, partner, joint venturer or employee of the other Party for any purpose whatsoever, and neither Party shall have any authority to enter into any contracts (other than settlement agreements pursuant to the applicable provisions of this Agreement) or assume any obligations for the other Party nor make any warranties or representations on behalf of such other Party.

**15.3 Waiver and Modification**. The waiver by either Party of a breach of any provision contained herein shall be effective only if in writing and shall in no way be construed as a waiver of any succeeding breach of such provision or obligation or the waiver of the provision or obligation itself. This Agreement may not be changed, modified, amended or supplemented, except by an express written instrument signed by both Parties.

**15.4 Assignment**. This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and their respective successors and permitted assigns; provided, however, that neither Party may assign or transfer this Agreement without the prior written consent of the other Party, except that no consent shall be required if such assignment or transfer is (i) to an Affiliate of the assigning Party, or (ii) in connection with a merger or acquisition or sale of all or substantially all of the assets of the assigning Party. Any assignment or transfer in contravention of this Agreement shall be null and void *ab initio*.

**15.5 Use of Affiliates.** Unless otherwise set forth herein, each Party shall have the right to exercise its rights and perform its obligations under this Agreement either itself or through any of its Affiliates; provided, however, that whenever a Party's Affiliate is acting, or failing to act, with respect to a matter which would be within the scope of this Agreement if such action or failure to act were performed by such Party, such Party shall direct such Affiliate to perform its actions in a manner that is consistent with such Party's obligations under this Agreement and if such Affiliate acts or fails to act in a manner that would violate any obligation or condition applicable

to such Party under this Agreement, such act or failure to act shall be deemed an act or failure to act of such Party. (For clarity, whenever this Agreement specifies that a Party's obligation consists of directing an Affiliate to perform or not to perform an act, the obligation that attaches to the Affiliate pursuant to the preceding sentence is the performance or nonperformance of such act, not the direction to perform or not perform it.)

**15.6 Severability**. If any provision of this Agreement shall be held illegal or unenforceable, such provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

**15.7 Further Assurances**. Each Party shall undertake and carry out its obligations in connection with this Agreement in good faith, and shall cooperate with each other in good faith throughout the performance of this Agreement. Each Party shall execute, acknowledge and deliver such further instruments and documents, and do all such other acts, as may be reasonably necessary or appropriate, in order to carry out the purposes and intent of this Agreement. To the extent either Party incurs costs or expenses related to obligations or responsibilities of the other Party, such Party shall invoice the responsible Party for such costs and expenses, and the responsible Party shall pay the invoicing Party within thirty (30) days of receipt of such invoice.

**15.8 Use of Party's Name**. Except as otherwise required by Applicable Law, no right, express or implied, is granted by this Agreement to either Party to use in any manner the name of the other Party or any other trade name or trademark of such other Party in connection with the performance of this Agreement. For clarity, it is understood that nothing herein shall prohibit either Party from using the name of such other Party (i) in certain of such Party's disclosure documents, including those filed or disclosed in order to comply with its obligations under Applicable Law or the listing standards or agreements of any national or international securities exchange or The NASDAQ Stock Market or other similar laws of a Governmental Authority, but only to the extent that the disclosure of such other Party's name is required by Applicable Law, (ii) to respond to an inquiry of a Governmental Authority, or (iii) in a judicial, administrative or arbitration proceeding, for so long as such use of such other Party's name is limited to statements of fact and is not done in a manner to suggest or imply endorsement by such other Party.

**15.9 Notices.**

15.9.1 Any notice or other communication to be given under this Agreement by any Party to the other Party shall be in writing and shall be deemed duly given (a) on the date delivered, if personally delivered, (b) on the date sent by facsimile transmission (if transmitted before 5:00 p.m. recipient's local time on a business day, or if not, on the following business day) with automatic confirmation by the transmitting machine showing the proper number of pages were transmitted without error, (c) on the business day after being sent by Federal Express or another recognized overnight mail service which utilizes a written form of receipt for next day or next business day delivery, or (d) five (5) business days after mailing, if mailed by certified or registered mail, return receipt requested, in each case addressed to the applicable party at the address set forth below (provided, however, that a party may change its address for receiving notice by the proper giving of notice hereunder):

| | |
|---|---|
| If to Endo at: | Endo Ventures Limited<br>First Floor, Minerva House, Simmonscourt Road<br>Ballsbridge, Dublin 4, Ireland<br>Attention: Head of EVL and SVP of Supply Chain<br>Facsimile: +353 1 268 2029 |
| With a copy (which shall not constitute notice) to: | Par Pharmaceutical, Inc.<br>6 Ram Ridge Road<br>Chestnut Ridge, NY 10977<br>Attention: Legal<br>Facsimile Number: (845) 573-5600<br>Email: LegalNotices@endo.com |
| If to either of the RK Parties: | RK Pharma Inc.<br>401 North Middletown Road,<br>Building 215/215A,<br>Pearl River, New York 10965, USA<br>Attention: Dr. Ravishanker Kovi<br>Email: Ravi@rkpharmainc.com<br><br>With a copy (which shall not constitute notice) to<br><br>Sheppard Mullin, Richter & Hampton LLP<br>30 Rockefeller Plaza<br>New York, NY 10112<br>Attention: Shon Glusky<br>Email: sglusky@sheppardmullin.com<br>Facsimile: (212) 655-1717 |

**15.10 Governing Law and Jurisdiction**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to the choice of law principles thereof other than those that may permit designation of New York law. The Parties irrevocably agree that the State and Federal Courts located in the State, City and County of New York, shall have exclusive jurisdiction to deal with any disputes arising out of or in connection with this Agreement and that venue is proper in such Courts. Each Party hereby expressly consents and submits to the personal jurisdiction of the Federal and State Courts in the State and County of New York.

**15.11 Force Majeure**. A Party shall not be liable for nonperformance or delay in performance to the extent that such nonperformance or delay in performance is not due to its negligence and is caused by any event reasonably beyond the control of such Party, including wars, hostilities, revolutions, riots, civil commotion, national emergency, epidemics, fire, flood, earthquake, force of nature, explosion, terrorist act, embargo, or any other Act of God, or any law, proclamation, regulation, ordinance, or other act or order of any court, Governmental Authority (each a "**Force Majeure Event**"). In the event that either Party is prevented from discharging its

DocuSign Envelope ID: 380537DB-A104-4DB9-9D7D-FF8B93C35523

obligations under this Agreement on account of a Force Majeure Event, such Party shall notify the other forthwith, and shall nevertheless use Commercially Reasonable Efforts to discharge its said obligations, even if in a partial or compromised manner. If either Party is unable to perform its obligations hereunder as a result of a Force Majeure Event for a period of ninety (90) days or longer, then the other Party shall have the right, upon its issuance of notice to the other Party, to terminate this Agreement.

**15.12 Entire Agreement**. This Agreement (and any Schedules, Exhibits attached hereto) constitute the entire agreement between and among the Parties with respect to the API and supersede all prior representations, understandings and agreements with respect to the API.

**15.13 Counterparts**. This Agreement may be executed in one or more counterparts, including by transmission of facsimile or PDF copies of signature pages, each of which shall for all purposes be deemed to be an original and all of which together shall constitute one instrument.

**15.14 Third Party Beneficiaries**. Except as expressly provided herein, nothing in this Agreement, either express or implied, is intended to or shall confer upon any Third Party any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**15.15 Cumulative Rights**. The rights and remedies of each of the Parties under or pursuant to this Agreement are cumulative, may be exercised as often as such Party considers appropriate and are in addition to its rights and remedies under general law.

**15.16 Joint and Several**. Notwithstanding anything to the contrary herein, the obligations of each of the RK Parties, shall be joint and several, regardless of whether a particular provision refers to one or both of the RK Parties.

**[SIGNATURE PAGE FOLLOWS]**

DocuSign Envelope ID: 380537DB-A104-4DB9-9D7D-FF8B93C35523

**IN WITNESS WHEREOF**, the Parties hereto have executed this Co-Development, License and Supply Agreement to be effective as of the Effective Date.

**ENDO VENTURES LIMITED**

By: DocuSigned by: James Papp
FA6BDAE5DAA0460...

Name: James Papp

Title: Director

Approved by

Legal: DC

**RK PHARMA, INC.**

By: Dr. Ravi Shanker

Name: Dr. Ravishanker Kovi

Title: Founder & Executive Chairman

**APICORE PHARMACEUTICALS PVT. LTD.**

By: [signature]

Name: Dr. Jayaraman Kannapan

Title: President & CEO

DocuSign Envelope ID: 380537DB-A104-4DB9-9D7D-FF8B93C35523

**Schedule 1**

**Specifications**

| S. No | TEST | SPECIFICATION |
|---|---|---|
| 1. | Description | Brown color powder. |
| 2. | Solubility | Sparingly soluble in 1N HCl solution by heating at 80°C. |
| 3. | Identification<br>a) By Ferric iron | Should be positive. |
| | b) By Citrate test | The retention time of the citric acid peak in the chromatogram of test sample should match with the retention time of citric acid standard peak as obtained from the test of citrate content by HPLC. |
| | c) By FT-IR | Sample spectrum should correspond to that of identification standard spectrum of ferric citrate. |
| 4. | Water content by KF | Between 14.0 and 20.0 % w/w |
| 5. | Chloride content by IC | Not more than 2000 ppm |
| 6. | Total iron content by ICP-MS (as is basis) | Between 20.00% to 22.00 % w/w |
| 7. | Ferrous content by Titration | Not more than 0.50 % w/w |
| 8. | Citrate content by HPLC (as is basis) | Between 53 % and 67 % w/w |
| 9. | β-Ferric Oxide Hydroxide content** | Not more than 1.0 % w/w |
| 10. | Related impurities by HPLC | |
| | Method-1: | |

| S. No | TEST | SPECIFICATION |
|---|---|---|
| | Itaconic acid content<br>Methacrylic acid content<br>Cis-aconitic acid<br>Trans-aconitic acid<br>Citraconic acid<br>Pyruvic acid and Oxobutanedioic acid<br>Any unspecified impurity | Not more than 0.05 % w/w<br>Not more than 0.05 % w/w<br>Not more than 0.05 % w/w<br>Not more than 0.05 % w/w<br>Not more than 0.05 % w/w<br>Not more than 0.05 % w/w<br>Not more than 0.05 % w/w |
| | Method-2:<br>Oxalic acid | <br>Not more than 0.05 % w/w |
| | Method-3:<br>Acetoacetic acid | <br>Not more than 0.05 % w/w |
| | Total impurities<br>(Method-1 + Method-2 + Method-3) | Not more than 0.50 % w/w |
| 11. | Specific surface area by Specific Surface area analyzer | Between 16.0 to 20.0 $m^2/g$ |
| 12. | Residual solvents by HS-GC<br>Method-I:<br>Acetone | <br><br>Not more than 4166 ppm |
| | Method-II:<br>Formic Acid | <br>Not more than 4166 ppm |
| 13. | Diacetone alcohol content by GC | Not more than 416 ppm |
| 14. | Content of Mesityl oxide by GC | Not more than 12.5 ppm |
| 15. | Particle size distribution (µm)<br>D10<br>D50<br>D90 | <br>NMT 15 µm<br>Between 25-80 µm<br>Between 150 to 250 µm |
| 16. | Elemental Impurity by ICP-MS<br>Cadmium | <br>Not more than 0.417 ppm |

DocuSign Envelope ID: 380537DB-A104-4DB9-9D7D-FF8B93C35523

| S. No | TEST | SPECIFICATION |
|---|---|---|
| | Arsenic<br>Mercury<br>Cobalt<br>Vanadium<br>Nickel<br>Lead | Not more than 1.25 ppm<br>Not more than 2.5 ppm<br>Not more than 4.17 ppm<br>Not more than 8.33 ppm<br>Not more than 16.67 ppm<br>Not more than 0.417 ppm |
| 17. | Aluminium content by ICP-OES | Not more than 100 ppm |
| 18. | Sodium content by ICP-OES | Not more than 1000 ppm |
| 19. | X-ray diffraction (PXRD) test | Should be amorphous |
| 20. | Control of acid insoluble | Not more than 0.05 % |
| 21. | Microbiological Enumeration Tests:<br>Total Aerobic microbial count<br>Total Yeast and mold count<br>Test for specified microorganism:<br>Escherichia coli | <br>Not more than 1000 CFU/g<br>Not more than 100 CFU/g<br><br>Should be absent per gram. |
| 22. | Phosphate binding capacity by IC (Range is applicable for pH 3 and 7.5 at 300 mili molar concentration). | At pH 3.0: Between 25 and 35 mg/g*<br>At pH 7.5: Between 15 and 25 mg/g* |

* Phosphate binding capacity test specifications shall be as per mutually agreed specification which are being discussed between the Parties. If any change to the specifications defined here shall be captured as an amendment at a later date.

** Note that Beta Ferric Oxyhydroxide method to be validated by the RK Parties by April 30, 2022 to Endo's satisfaction.